*E-FILED 6/9/05*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ERIC AUSTIN NIVA, | NO. 5:03-cv-0908 RS |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Eric Austin Niva ("Niva") filed this action against defendant United States of America, through its agency the Bureau of Land Management ("BLM"), pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, as a result of injuries Niva sustained in a motor vehicle accident on Clear Creek Road ("CCR"), located in the Clear Creek Management Area ("CCMA") of the Monterey National Forest. Niva contends that due to the BLM's failure adequately to maintain the CCR, on the evening of April 21, 2001 the vehicle he was driving hit a dangerously eroded area of the roadway, causing it to roll down the adjacent hillside. The BLM responds that it was under no obligation to maintain the road and that, even assuming it had been charged with that responsibility, the discretionary function exception set forth in the FTCA exempts it from liability. In addition, the BLM contends that it is insulated from liability

under the state of California's recreational use immunity statute. Finally, the BLM argues that even were it legally responsible for the maintenance of CCR, Niva's own negligence was the sole cause of the accident and his resulting serious injuries. The case was tried to the Court sitting without a jury. Based on all testimony and evidence submitted, and pursuant to Fed. R. Civ. Pro. 52, the Court enters the following findings of fact and conclusions of law.

## II.   FINDINGS OF FACT[1]

1. CCMA, originally established in 1905 as part of the Monterey National Forest, consists of approximately 50,000 acres of land and is among the 300,000 acres of public land administered by the BLM.

2. CCMA is one of the most popular sites in California for off-highway vehicle use, including off-road motorcycle use. Approximately 85% of the visitors to CCMA are off-road motorcycle users.

3. CCR, a dirt road that varies in width from eight feet to twenty feet, is the main entry point into the CCMA. Since at least 1988, CCR was maintained by San Benito County ("County"), which had obtained an easement from the BLM for the CCR right-of-way.

4. In 1992, Max Bridges ("Bridges"), who was then the County Director of Public Works, spoke with Robert Beehler ("Beehler"), the Manager of the BLM Hollister Field Office, regarding the County's desire to terminate maintenance on CCR due to safety concerns and costs. Beehler expressed concern to Bridges over who would absorb the costs of maintenance of the road if the County no longer utilized its funds for that purpose since the BLM Manual prohibits the use of BLM appropriated funds to construct, improve, or maintain roads which are not owned or controlled by the BLM.

5. As a result of the discussions between Bridges and Beehler, on May 27, 1994, a Memorandum of Understanding ("MOU") was entered into between the County and the BLM. The MOU recited that, due to the County's desire to be relieved of the burden of maintenance of County roads in the

---

[1] To the extent that the Court has inadvertently labeled a finding of fact as a conclusion of law, or vice versa, the conclusions shall be considered "in [their] true light, regardless of the label that the....court may have placed on [them]." Tri-Tron International v. Velto, 525 F.2d 432, 435-36 (9th Cir. 1975).

2

1      Clear Creek Area, and the BLM's willingness to assume those maintenance responsibilities, a grant obtained by the County for road maintenance and improvements would be extended to December 1995. Further, under the terms of the MOU, funds obtained from the grant would be given to the BLM. The MOU also provided that $40,000 of the grant funds would be designated for a route inventory and maintenance plan throughout the CCMA.

6. In December 1994, the County Board of Supervisors initiated the requisite procedure to terminate maintenance on CCR, pursuant to California Streets & Highways Code § 954.5. After adoption of the resolution to terminate maintenance of CCR and other County roads within the CCMA, the County posted a sign on CCR notifying drivers that they had come to the end of the County maintained road. Despite the termination of its maintenance responsibilities, the County retained its easement rights in the roadway.

7. Pursuant to the MOU, the BLM hired Pacific Watershed Associates ("PWA") to inventory the roads in the CCMA and to study the erosion and maintenance problems therein.

8. In March 1995, unusually heavy storms struck Northern California and washed out sections of CCR and other roads within the CCMA. The CCMA was closed to the public for a period of time following those storms, known as *El Nino*, so that road repairs could be completed.

9. David Slibsager ("Slibsager"), Maintenance Director of the CCMA, was charged with the responsibility of reopening the CCMA for public use following the storms. His crews undertook emergency repairs to CCR, for which the BLM was reimbursed by the County with the funds that the County had obtained from the Federal Emergency Management Agency ("FEMA").

10. In August 1995, PWA issued its recommendations for the construction and maintenance of all facilities within the CCMA. That report noted that maintenance had been terminated on all County roads and that, accordingly, most of the maintenance responsibility fell to the BLM. The report also proposed a plan for road reconstruction and erosion prevention control.

11. In October 1995, the BLM followed the recommendations suggested by PWA and implemented road reconstruction and repairs throughout the CCMA. These included the redesign of that portion of CCR where Niva's subsequent accident occurred to enlarge two culverts and to install a "rolling

3

dip" to channel water over and off the road. The work was completed by Slibsager and his crews, as well as by County and private crews, compensated with funds obtained by the County from the state of California's Off-Highway Vehicle ("OHV") Fund.

12. A corrective maintenance protocol was established by the BLM in October 1995 for route maintenance in the CCMA. The protocol stated that the BLM would conduct necessary road maintenance on all roads for which the County had terminated its maintenance responsibilities. BLM's maintenance costs on such roads would be absorbed by using non-federal dollars. Beehler testified at trial that the protocol was in effect at the time of the accident in April 2001.

13. On January 7, 1999, the BLM issued an amended resource management plan for the CCMA. That plan stated that recurring and corrective maintenance on County roads would be implemented annually as appropriate.

14. On the evening of April 21, 2001 at approximately 9:00 p.m., Niva and an acquaintance, Justin Murphy ("Murphy"), left Los Gatos, California and headed for the CCMA. Along the way, Niva stopped at a liquor store and emerged with a small brown bag. Murphy believed that the bag contained a pint size bottle of vodka, although he did not see the actual bottle. Niva consumed the contents of the bottle during his drive to the CCMA.

15. Murphy testified at trial that, once the pair had driven through Hollister, Niva began driving at an excessive speed. Murphy recalls asking Niva to slow down more than once, but testified that Niva did not comply. Murphy stated that Niva continued to drive too fast once they entered the CCMA.

16. Niva proceeded on CCR and passed the Oak Flat Campground. As the pair approached a turn past the campground, Murphy testified that he felt the truck hit a washout area, felt the back of the truck come up, and then felt the truck flip over as it rolled down a slope. Murphy did not know how many times the truck rolled over during its descent, nor could he recall when or if Niva was thrown from the truck.

17. The truck ultimately came to a stop on the driver's side. Murphy testified that he was wearing his seatbelt at the time, but could not recall if Niva was as well. Murphy was not injured in the

4

accident, so he exited the truck, called for Niva and, hearing no response, climbed up the hill and ran down the road to the Oak Flat Campground to get help.

18. When Murphy returned to the accident scene with some campers, he found Niva lying against the front bumper of the pickup truck. Niva suffered serious injuries as a result of the accident which have rendered him a quadriplegic.

19. Niva testified at trial that he has no memory of the accident or the drive to CCMA, but recalls that he had been to CCMA on many prior occasions. He testified that he had driven on CCR several times before the accident. Murphy stated that he, too, had been to CCMA before the accident and that he had previously driven on CCR.

20. Following the accident, an emergency crew from the California Department of Forestry ("CDF") arrived at the site, as did BLM Ranger William Schwartz. California Highway Patrol ("CHP") Officers Treiner and Pierce also responded to the scene. Murphy spoke to Ranger Schwartz, and provided a statement to the CHP, regarding the accident.

21. CHP Officer Treiner was the investigating officer charged with primary responsibility for preparing the accident report, while Officer Pierce was placed in charge of drawing a diagram of the accident scene. The diagram reflects a twenty-foot long, straight tire mark starting from the right front wheel of Niva's truck and ending twelve feet south of the roadway edge.

22. The morning after Niva's accident, Ranger Schwartz placed barriers adjacent to the washout area as warning devices to other drivers. A few days later, he met with Gary and Lisa Niva, the father and sister of Eric Niva, respectively, regarding the accident. Although the washout had been repaired at that time, Ranger Schwartz showed the Nivas where the accident had occurred and explained that, since the design of CCR in 1995, the rainfall which accumulates above the road flows directly across CCR and erodes a portion of the road or shoulder of the road.[2]

23. Allen Weber ("Weber"), a licensed civil and traffic engineer, testified as an expert witness for Niva.

---

[2] At trial, Ranger Schwartz initially classified the washout as "....a portion of the road that appears to be missing." See RT at 372, lines 21-22. He later testified, however, that he had "....categorized it as a portion of the shoulder of the road that seemed to be missing." Id. at 376, lines 17-18.

5

|    |     |                                                                                                  |
|----|-----|--------------------------------------------------------------------------------------------------|
| 1  |     | He explained that the approach to the accident site on CCR contained a horizontal and vertical  |
| 2  |     | curve. The vertical curve, according to Weber, was impacted by an elevation in the road as a driver |
| 3  |     | approached the site, whereby the driver's view remained obscured until the driver reached the crest |
| 4  |     | of that elevated section. As described by Weber, the view of the horizontal curve which turned to |
| 5  |     | the left was blocked by the vertical curve in the form of the rise in the road. |
| 6  | 24. | Weber also testified that, at the time of the accident, Niva was limited to the sight distance within |

24. Weber also testified that, at the time of the accident, Niva was limited to the sight distance within the exposure of his headlights. He noted that, as Niva's vehicle went to the crest of the hill, the truck's lights would be straight ahead, illuminating the area directly in front of the vehicle. From the crest of the hill to the washout area where Niva's truck veered off the road, Weber measured a distance of 35-40 feet. Based on that measurement, and assuming that Niva was traveling at a speed of 25 mph on CCR, Weber concluded that Niva's vehicle would travel 57 feet from the crest, beyond the washout area, before the driver could react to the washout and take steps to avert it. As a result, Weber opined that the roadway constituted a hidden danger due to the presence of the vertical curve, the horizontal curve, and the sight distance of 35-40 feet, combined with the fact that the accident occurred during nighttime hours.

25. In addition, Weber opined that the washout area intruded into the traveled portion of the roadway, and was not confined to the shoulder area of the road as averred by the BLM. In sum, Weber concluded that the accident was caused by three main factors: (1) the geometrics (i.e., the curves and sight distance) of the road; (2) erosion; and, (3) driver conduct. On cross-examination he conceded that safety devices such as barricades, delineators, or other warnings of the washout, would not have stopped Niva's vehicle.

26. Rudy Degger ("Degger") testified as an expert on behalf of the BLM on the subject of accident investigation and reconstruction. He opined that the washout was located primarily on the shoulder of the roadway rather than on the traveled portion of the road and concluded, therefore, that the washout played either an insignificant part or no part at all in the cause of the accident, which he attributed to driver error, speed, and alcohol consumption. Degger's conclusion was based on the CHP diagram, which reflected the trajectory of Niva's truck prior to reaching the washout area,

from which he concluded that the vehicle inevitably would have run off the road regardless of the roadway's condition. On cross-examination, Degger conceded that if a washout six feet long and eight feet wide was located in the traveled portion of the roadway, it would constitute a dangerous condition.

### III.  CONCLUSIONS OF LAW

A.  The Duty to Maintain Clear Creek Road

The BLM argues that, because the County did not abandon its right-of-way easement over CCR, the road remains a County road and, therefore, responsibility for the maintenance of the roadway does not lie with the BLM. See e.g., McManus v. Sequoyah Land Associates, 240 Cal.App.2d 348, 356 (1968) (law is "well-settled" that duty to repair easement lies with easement holder rather than with land owner); Herzog v. Grosso, 41 Cal.2d 219, 228 (1953) (owner of a servient tenement has no obligation to repair the easement); Bean v. Stoneman, 104 Cal. 49, 55-56 (1894) (owner of easement must keep it in repair); Cal. Civ. Code § 845(a) (owner of easement shall maintain it in repair). Niva does not dispute that the County maintained its easements rights in CCR. Nonetheless, he contends that, once it received notice that the County intended to abandon maintenance of the road, the BLM either contractually or voluntarily accepted maintenance responsibility for that roadway so that the public could continue to gain access to CCMA. Having voluntarily assumed a duty to maintain CCR in an operable condition, Niva states that the BLM is liable for the injuries he sustained as a result of its failure to repair the washout to that road. See BAJI 4.55; 6 Witkin, Summary of California Law, (9th Ed. Torts §§ 868-872).

The evidence presented at trial supports the contention that the BLM assumed maintenance responsibility for CCR. The documents signed by the BLM, specifically: (1) the December 1994 MOU (see Exh. 35); (2) the 1995 Protocol (see Exh. 51A at p. 677); and, (3) the Amended Hollister Resource Management Plan (see Exh. 54 at p. 810), all state that the BLM will conduct necessary maintenance on County roads which have not been abandoned.[3]  The record is undisputed that the County did not abandon its easement in CCR and Beehler, the Manager of the BLM Hollister Field Office, testified that the Protocol

---

[3]  With respect to any roads which the County decided to abandon, the 1995 Protocol provided that those roads would become BLM roads.

7

1 remained in effect at the time of Niva's accident in 2001. <u>See</u> Reporter's Transcript ("RT") at pp. 170-171.
2 In addition, Beehler and Slibsager, both BLM employees, testified that the BLM reconstructed, repaired,
3 and stabilized CCR in 1995, 1997, and 1999. <u>Id.</u> at pp. 74, 76, 79, 239, 280-283, 475-476, 478, 485-
4 487. Moreover, the financial records presented to the Court established that, at least with respect to
5 repairs performed in 1995 following the *El Nino* storms, projects were completed with BLM funds and
6 that, thereafter, the County reimbursed BLM for the work. <u>Id.</u> at pp. 241-244. The BLM's control over
7 the portion of CCR where the accident occurred is underscored by the actions of Ranger Schwartz
8 following the accident in placing warning barriers adjacent to the washout area. Based on the documents
9 and testimony presented, therefore, the Court concludes that the BLM accepted maintenance responsibility
10 for CCR.

B. <u>The Discretionary Function Exception to the FTCA</u>

The BLM argues that, even assuming a duty on its part to maintain CCR, this action must be dismissed under the discretionary function exception to the FTCA. In particular, the BLM explains that it made the discretionary decision, based on public policy concerns, not to maintain the road, thereby precluding the Court from exercising jurisdiction over any claim that arises as a result of that decision. A two-part test applies in determining whether the discretionary function exception bars an FTCA claim. First, the act or decision at issue must have been "discretionary in nature," meaning that it must have involved "an element of judgment or choice." <u>United States v. Gaubert</u>, 499 U.S. 315, 322 (1991). Second, the act or decision must have been "based on considerations of public policy." <u>Id.</u> at 323.

The evidence presented establishes that the BLM meets the first prong of the Supreme Court's test, since the BLM was afforded the discretion to decide whether to maintain roads such as CCR belonging to state or local governments. Having exercised that discretion by undertaking maintenance responsibilities on CCR, however, BLM's failure to repair the washout area cannot be characterized as a policy determination. Rather, as the Ninth Circuit recently concluded, removal of a hazard is a matter of safety rather than policy and, accordingly, is not protected under the discretionary function exception to the FTCA. <u>Whisnant v. United States of America</u>, 400 F.3d 1177 (9th Cir. 2005).

The government reads <u>Whisnant</u> to carve out only a claim for negligence in connection with design

8

implementation and notes that here Niva makes no such claim, but instead argues that the roadway, constructed in full accordance with the design, results in dangerous erosion. The facts in Whisnant, however, do not reflect such a limited carve out, but rather suggest the viability of a negligence claim where an apparently properly constructed facility was nonetheless dangerously maintained. In that case, plaintiff successfully argued that mold allowed to develop in an otherwise properly constructed commissary was a "maintenance" as opposed to a discretionary function exempted "design" theory of negligence liability. Niva makes a similar claim here: that the BLM, having reconstructed CCR, failed to maintain it in a safe and operable condition.  He notes that, as reaffirmed in Whisnant, the BLM has no discretion "to abdicate its responsibility for safety." Id. at 1185.  That decision is consistent with prior Circuit precedent wherein government decisions concerning designs were held to be shielded by the discretionary function exception, but maintenance activities were not.[4]  Based on the evidence adduced at trial and the governing precedent, the discretionary function exception under the FTCA is not operative in this instance to divest the Court of jurisdiction to adjudicate Niva's negligence claim.

C.     Recreational Use Immunity Pursuant to Cal.Civil Code § 846

The BLM also argues that it is entitled to immunity from Niva's claim for damages based on the state of California's recreational use statute, codified at Cal. Civ. Code § 846.  Section 846 provides that a landowner owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose, unless the landowner: (1) willfully or maliciously fails to guard against or to warn of a dangerous

---

[4] See e.g., ARA Leisure Servs. v. United States, 831 F.2d 193, 195 (9th Cir. 1987) (in suit arising from alleged negligent design and maintenance of national park road, designing road without guard rails was shielded by the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1027-28, 1031 (9th Cir. 1989) (decision not to line canal w/concrete was susceptible to policy analysis, but decision not to remove unsuitable materials from canal during construction was not); Valdez v. United States, 56 F.3d 1177, 1178, 1180 (9th Cir. 1995) (decision not to post warning signs of obvious dangers in national parks involved exercise of policy judgment which Congress meant to shield); Childers v. United States, 40 F.3d 973, 976 (9th Cir. 1994) (government's decision to use brochures rather than warning signs to post dangers of unmarked trails susceptible to policy analysis); Summers v. United States, 905 F.2d 1212, 1215 (9th Cir. 1990) (policy judgment absent when govt. simply failed to warn of danger to barefoot visitors of hot coals on beach park); Bear Medicine v. United States, et al., 241 F.3d 1208, 1214, 1217 (9th Cir. 2001) (while govt.'s authorization of worker's contract protected under discretionary function exception, failure to monitor and ensure worker safety was not); Indian Towing Co. v. United States, 350 U.S. 61 (1955) (decision to adopt safety precautions may be based on policy considerations and need not be adopted, but, once undertaken, implementation of precautions is not based on policy considerations).

condition; (2) conditions entry on the receipt of consideration; or, (3) expressly invites the guest to use the premises. Cal. Civ. Code § 846. The Ninth Circuit has determined that this statutory immunity applies to the United States and, accordingly, that the BLM is entitled to rely on the statute as a defense to a suit brought under the FTCA to the same extent as would a private individual. Simpson v. United States, 652 F.2d 831, 833 (9th Cir. 1981) (Section 846 immunity applies to United States); Mattice v. United States, 969 F.2d 818 (9th Cir. 1992) (same). Morever, Section 846 immunity applies not only when a plaintiff is injured while engaged in recreational activity, but at any time the plaintiff enters onto the landowner's premises for the purpose of engaging in recreational activities. Mattice v. United States, 969 F.2d at 821.[5]

As a precondition to immunity, a landowner must satisfy two elements. Ornelas v. Randolph, 4 Cal.4th 1095 (1993). First, the defendant must be the owner of some interest in the real property where the accident occurred. Id. Second, the plaintiff's injury must have resulted from entry upon or use of the premises for a recreational purpose. Id. In this instance, the evidence is undisputed that Niva and his passenger were driving on CCR, within CCMA, and were traveling to a CCMA location to meet friends and participate in off-road motorcycle riding. It is also undisputed that the CCMA is owned by the United States and is under the jurisdiction of the BLM. Therefore, the conditions for immunity under § 846 are triggered.

As noted above, there are three exceptions to the grant of immunity afforded under § 846. One of the exceptions, the payment of consideration, is not applicable in this case since it is undisputed that Niva paid no fee to enter the CCMA. The second exception, an express invitation, requires that the landowner specifically invite the guest onto his premises. See Johnson v. Unical Corp., 21 Cal.App.4th 310 (1993); Revell v. United States, 22 F.3d 960 (9th Cir. 1994). Although Niva argues that this exception should apply in instances such as this where the landowner advertises its recreational facilities in brochures and local newspapers, he concedes that current caselaw requires a personal invitation from the landowner to the guest; a circumstance not present here. Id. Therefore, only the third exception, willful or malicious failure to warn of a danger, potentially applies.

---

[5] Mattice also held that the recreational use statute applies to paved and public roads, thereby defeating Niva's argument that, since CCR is a public thoroughfare, the government cannot claim immunity.

To establish willful misconduct under California law, it is plaintiff's burden to establish that the defendant: (1) had actual or constructive knowledge of the peril; (2) had actual or constructive knowledge that injury was probable, as opposed to possible; and, (3) consciously failed to act to avoid the danger. Mattice v. United States, 969 F.2d at 822. Id. Moreover, the Mattice court noted that the cases in which willful misconduct was found all involved a hidden peril. Id.

With respect to the first requirement, the evidence establishes that the BLM had actual or constructive knowledge of the peril. Gary and Lisa Niva both testified that Ranger Schwartz told them that he knew about the washout prior to the accident and that he had requested that repairs be made to fix the roadway. See RT at pp. 149, 598-599. Ranger Schwartz also described how, since the reconstruction of CCR in 1995, rainfall from above the roadway flows freely across CCR, eroding a portion of the road or shoulder. Id. at pp. 377-379. Although he could not recall whether he had reemphasized to the BLM that repairs to the roadway were necessary in the three or four months prior to Niva's accident, Ranger Schwartz confirmed that he had sent a memo to the BLM regarding the issue at least three or four years prior to the 2001 accident. Id. at pp. 378, 389, 395.
Based on the uncontroverted trial testimony of the Nivas and Ranger Schwartz, the Court concludes that the BLM knew that a dangerous condition existed on CCR at the time of Niva's accident in April 2001.

With respect to the second prong of the "willful and malicious" exception to the statute, however, the evidence submitted at trial failed to establish that the BLM had actual or constructive knowledge that injury was probable, as opposed to just possible, due to the existence of a washout on CCR since there was no evidence that any prior accidents or injuries had ever occurred at the site. As the Ninth Circuit has stated, it is insufficient simply to establish that government employees knew that potentially dangerous conditions occasionally existed on the roadways. See e.g., Spires v. United States, 805 F.2d 832 (9th Cir. 1986) (plaintiff failed to establish that government had knowledge of probable injury based on employees' knowledge that ditches caused by flow from storm sewer sometimes occurred on roadway). Rather, a plaintiff seeking to recover damages must establish application of the "wilful and malicious exception" to the immunity statute by showing "any intentional act of an unreasonable character undertaken in disregard of a known risk or a risk so obvious that the actor must be taken to have been aware of it, and so great as to

11

make resulting harm highly probable." Id. at 834.

Moreover, even if prior accidents had occurred at the Niva site, the Ninth Circuit has concluded that knowledge of prior accidents is insufficient to place the government on notice that serious injury is probable where the subsequent accident did not occur in the same manner as did the previous occurrences. Mattice v. U.S. Dept. of Interior, 969 F.2d 818 (9th Cir. 1992). In Mattice, plaintiff sued the government for negligence after sustaining serious injury when he drove off the road at a curve, plowed through a wooden guardrail, and plunged down a hill in Redwood National Park. Mattice argued that the "wilful and malicious" exception to statutory immunity applied because the government knew that nine accidents had occurred on the road on which he was injured. Nevertheless, judgment in favor of the government was affirmed pursuant to California's recreational use immunity statute based on the finding that none of the prior accidents had happened at the curve, nor had any of the prior accidents involved either vehicles breaking through the guardrail, or serious injury. Id. at 823. As a result, the Court concluded that the government did not have knowledge that injury would probably occur as a result of its failure to install metal guardrails or warning signs informing motorists of the winding road.

Niva ignores the Mattice decision and instead relies on the Ninth Circuit's decisions in Termini v. United States, 963 F.2d 1264 (9th Cir. 1992) and other cases[6], to support his argument that recreational use immunity cannot shield the government's actions in this instance since the BLM engaged in wilful and malicious behavior by failing to repair the washout on CCR. In Termini, the Ninth Circuit held that the United States Forest Service had engaged in wilful and malicious conduct under California's recreational use statute by building and maintaining a spur along a canyon road without posting warning signs indicating that the spur ended in a cliff. Noting that constructive knowledge under California law is measured by an objective standard, namely, "whether a reasonable man under the same or similar circumstances as those faced by the actor would be aware of the dangerous character of his conduct," the Circuit stated that a reasonable person standing in the shoes of the government would clearly have recognized the probability of

---

[6] See also Rost v. United States, 803 F.2d 448, 451 (9th Cir. 1986)(gate post that impaled vehicle passenger was camouflaged and, therefore, could not be seen by the driver); Simpson v. United States, 652 F.2d 831, 833 (9th Cir. 1981) (plaintiff not warned that bank could collapse and plunge visitor into scalding water).

12

an accident occurring on the spur since it leads, without warning, to a cliff's edge. Id. at 1268. In addition, the Court observed that, in maintaining the spur, the government had failed to observe its own safety standards, thereby supporting the conclusion that it possessed constructive knowledge that injury would likely result from its actions.[7] Id.

Niva's reliance on the holdings in Termini and its predecessors is, however, unavailing in this instance. The Termini, Rost, and Simpson decisions all involved a hidden peril which had caused an accident and resulted in injury. In contrast, Niva failed to present sufficient evidence that a hidden peril existed on CCR by virtue of the presence of the washout. As an initial matter, the testimony conflicted as to the precise location of the washout. While Ranger Schwartz first testified that a portion of the roadway had been washed out, he later changed his testimony to clarify that a portion of the shoulder of the roadway had been washed out. See RT at 372; 376. Similarly, while Niva's expert testified that, in his opinion, the washout was located on the traveled portion on the roadway, the BLM's expert disagreed and concluded that the washout was located on the shoulder of the road. Id. at 572, 662. In any event, the accident itself is not sufficient to demonstrate that injury was "probable" in light of the washout area, for the trajectory of the vehicle, as depicted on the CHP diagram, showed that it was headed off the roadway regardless of the presence of the washout. Id. at 573, 662. That conclusion was not refuted by Niva, whose expert did not address the trajectory of the vehicle.[8]

Moreover, applying the objective standard noted in Termini, the evidence presented does not suggest that a reasonable person, standing in the shoes of the BLM, would clearly recognize that the washout on CCR would probably cause injury. To the contrary, Ranger Schwartz testified that washouts have occurred at the site since the road was redesigned in 1995, yet no evidence of the occurrence of any prior accident was presented. Nor does this case present an instance, as in Termini and Rost, where the

---

[7] The Termini court also noted that safety regulations had been similarly ignored in Rost, another case in which the Circuit held that the government's actions were not shielded by California's recreational use immunity statute, stating that lack of compliance with known safety regulations is "an important factor in determining that [the government] possessed constructive knowledge that injury would likely result from its actions." Termini, 963 F.2d at 1268.

[8] Nor may Niva argue that the BLM's redesign of the roadway in 1995 created a hidden peril, since he concedes that, based on the Ninth Circuit's decision in Whisnant, the BLM is immune for any design defects which may exist on that roadway.

13

BLM failed to comply with known safety regulations.[9]  As a result, the Court finds that Niva failed to meet his burden that the BLM knew if it did not repair the washout to CCR injury was probable.[10]  Accordingly, the Court concludes that the "willful and malicious" exception to § 846 immunity is inapplicable in this case and, therefore, the United States is entitled to judgment in its favor based on that statutory immunity. A separate judgment will be entered in favor of the United States and against Niva, in accordance with the findings of fact and conclusions of law set forth herein.

IT IS SO ORDERED.

Dated: June 9, 2005

/s/ Richard Seeborg
RICHARD SEEBORG
United States Magistrate Judge

**THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN DELIVERED TO:**

---

[9] Although Niva presented evidence that the BLM ignored the PWA's recommendations regarding annual erosion control, the evidence adduced at trial showed that those recommendations are just that, recommendations, and did not rise to the level of a regulation or mandate, as was present in Termini and Rost.

[10] Based on this conclusion, it is not necessary for the Court to address the third prong of the exception, whether the BLM consciously failed to act to avoid the danger. In addition, because the government enjoys statutory immunity here, the Court need not address the question of comparative fault underlying the accident.

14

Mark St. Angelo    mark.st.angelo@usdoj.gov

John C Stein    boccardo@boccardo.com, tracey@boccardo.com;jstein@boccardo.com

**Dated: June 9, 2005**                                          **Chambers of Judge Richard Seeborg**

                                                                 **By:   /s/ BAK**