**\*E-FILED 4/11/08\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ERIC AUSTIN NIVA, | NO. C 03-0908 RS |
|         Plaintiff, | **OPINION AND ORDER** |
| v. | |
| UNITED STATES OF AMERICA, | |
|         Defendant. | |

I. INTRODUCTION

Plaintiff Eric Austin Niva seeks to recover for injuries he sustained when his truck ran off a road managed by the defendant United States of America through its agency, the Bureau of Land Management ("BLM"). Liability issues were bifurcated and tried to the Court over three days in February of 2005. The Court found BLM to be entitled to immunity under California's

1

1 "recreational use" statute, California Civil Code Section 846,[1] and entered judgment in favor of
2 BLM.

3 Niva appealed, and the Ninth Circuit Court of Appeals reversed, concluding that BLM is *not*
4 entitled to immunity under section 846. On remand, the parties now agree that remaining liability
5 issues are ripe for decision by the Court, without introduction of further evidence. Accordingly, in
6 conjunction with, and as a supplement to, the Findings of Facts and Conclusions of Law entered on
7 June 9, 2005, this Opinion and Order comprises the findings of fact and conclusions of law required
8 by Federal Rule of Civil Procedure 52(a). After carefully considering the sufficiency, weight, and
9 credibility of the testimony of the witnesses, their demeanor on the stand, the documentary evidence
10 admitted at trial, and the post-trial submissions of the parties both prior to the entry of the original
11 judgment and after remand, the Court finds the comparative fault of BLM for the injuries suffered by
12 Niva to be 65 % and that Niva's comparative fault is the remaining 35 %.

## II. DISCUSSION

A. BLM's alleged fault

At trial, Niva offered expert testimony from his expert witness Allen Webber to the effect
that: (1) the portion of the road where Niva's accident occurred was designed and constructed in a
manner that created a danger[2], and (2) the conditions of the road contributed to Niva's accident. In
essence, Weber's opinion was that the road was constructed in a way that erosion was inevitable and
that a rise in the road immediately preceding the curve where the erosion ocurred limited the time

---

[1] Section 846 provides that a landowner owes no duty of care to keep premises safe for entry or use by others for any recreational purpose, unless the landowner: (1) willfully or maliciously fails to guard against or to warn of a dangerous condition; (2) conditions entry on the receipt of consideration; or, (3) expressly invites the guest to use the premises.

[2] BLM contends that it cannot be liable under a theory of improper design, and Niva offers no argument or authority to the contrary. Webber's testimony regarding the design of the road was nevertheless relevant to questions of whether there was a hazzard, whether it was "hidden," and even to the question of whether BLM had knowledge of the hazzard. The testimony was also relevant to the question of whether BLM had properly maintained the road, a matter the Court previously found to be outside the "discretionary function" exception to governmental liability under the Federal Tort Claims Act. See Findings of Facts and Conclusions of Law entered on June 9, 2005 at section III (B).

2

during which drivers could see the curve as well as the eroded area, and react.

There was no significant dispute in the evidence at trial as to the existence of a large area of erosion or that Niva's vehicle entered that eroded area. There was some dispute as to whether the area of erosion was on the "shoulder" of the road or in the roadway itself. The evidence, however, established that the road in question did not have marked or otherwise clearly delineated shoulders. There is no dispute that as a result of the erosion, the width of the surface area on which vehicles could safely navigate was substantially less than in other portions of the road. Accordingly, it is of no particular consequence whether it was appropriate to characterize the erosion as occurring solely on the "shoulder" of the road or not. It undeniably presented a hazzard to be avoided. As set forth in the prior findings of fact and conclusions of law, the evidence also shows that BLM had actual knowledge of the hazzard. Additionally, the Ninth Circuit opinion in this case, which termed the eroded area a "ditch," observed that, "the ditch's size and location did make it *probable* that some unlucky driver would both hit the ditch and suffer an injury as a result." *Niva v. U.S. Bureau of Land Management*, 245 Fed.Appx. 621, 623 (9th Cir. 2007).

BLM bases its argument that the eroded area played no legally significant role in causing the accident primarily on the testimony of its expert that Niva was embarked on a straight-line path that would have taken him off the road whether or not there had been any erosion. Niva objects that the diagram purporting to show his straight line "trajectory" lacks sufficient foundation and is not reliable. Niva raised the same basic objection to the expert's testimony when he moved for a new trial prior to the appeal. In denying that motion, the Court found the objection to be untimely and that it should be overruled even if timely. See Order entered August 3, 2005 at 8:13-9:8. Niva now levels his attack more at the underlying diagram than on the expert's opinion, but again, Niva has failed to show that the diagram or the expert's opinion should be *excluded* as inadmissible for any reason.

That said, Niva's arguments about the circumstances under which the diagram was prepared do go to the *weight* it should be accorded. Niva is correct that it has not been shown to any degree of certainty that his "trajectory" necessarily was a straight line headed off the roadway. Ultimately, however, the question of Niva's "trajectory" is largely irrelevant. As Niva points out, there is no

3

1 conflict in the evidence that when his vehicle entered the eroded area, the drop off caused the path of
2 his vehicle to be altered. The truck veered to the right and began to roll down the hill. Thus, even
3 assuming that BLM had shown that Niva's trajectory would have necessarily resulted in him leaving
4 the roadway, it has not shown and cannot show that *this* accident, with the truck rolling down the hill
5 in the manner that it did, would have occurred even in the absence of the eroded area. Accordingly,
6 the Court finds that the presence of the eroded area, of which BLM was aware, was a cause of
7 Niva's accident and resulting injuries.

### B. Niva's alleged fault

Niva does not contend that he bears *no* responsibilty for this accident. Indeed, when Niva's expert was asked to identify the factors he believed played a part in the accident, he cited various road conditions and then stated, "I find it – well, I can't ignore this, and that would be driver conduct." RT 573:7-9. Although Niva's expert did not specify what "driver conduct" he felt contributed to the accident, the evidence at trial suggested three candidates: Niva's speed, his alcohol consumption, and his seatbelt use.[3]

#### 1. Speed

The evidence established that the only posted or otherwise stated speed limit applicable to the road where the accident occurred was 25 miles per hour. Under California's "basic speed law," however, no vehicle may be operated at a speed, "greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property," regardless of any limit otherwise posted or stated. Cal. Vehicle Code § 22350.

The evidence is inconclusive as to how fast Niva was driving at the time of the accident, but there is little, if any, evidence to support a conclusion that he was driving significantly in excess of the posted limit of 25 miles per hour. The evidence does support, however, a conclusion that Niva

---

[3] BLM argues that the seatbelt issue should be deferred until the damages phase of this action. That contention is rejected, for the reasons discussed below.

4

was driving at a speed "greater than [was] reasonable or prudent," particularly with regard to "visibility" (i.e., it was nighttime) and also with regard to the "surface and width" of the roadway.

Justin Murphy, Niva's passenger, testified that Niva was driving at an excessive speed for the conditions, and that he repeatedly asked Niva to slow down. While Murphy's subjective belief that Niva's speed was excessive would not necessarily be conclusive, the Court finds that Murphy was a credible witness who was in a position to evaluate the reasonableness of Niva's speed, and that his determination that the speed was excessive is sufficient to support a finding to that effect. Accordingly, the Court finds that Niva was driving at a speed greater than was reasonable or prudent under all the circumstances. Additionally, because a greater speed necessarily reduces the time a driver has to react to an upcoming road hazzard, the Court finds that Niva's excessive speed was a contributing factor to the accident.

### 2. Alcohol consumption

Although Niva denied any memory of doing so, there is no significant dispute that he stopped at a liquor store to make a purchase or that he emerged with a paper bag containing what Murphy believed to be a bottle of vodka. Niva argues that Murphy did not see exactly what the bottle was, and that it could have contained almost anything. Although Murphy stopped short of testifying that he had plainly seen a label on the bottle, he did testify that he saw the bottle itself (i.e, not just the bag) and that it appeared to him to be a pint (or possibly half-pint) of vodka. Murphy testified that Niva drank the entire bottle. Even assuming that Murphy could have been mistaken as to whether the bottle contained vodka as opposed to some other clear alcohol,[4] the Court finds that a preponderance of the evidence establishes that Niva purchased and consumed not less than a half pint of hard alcohol shortly before the accident occurred.

The evidence is inconclusive as to whether Niva consumed a pint or a half pint and as to the time it took for him to do so. Depending on Niva's personal tolerance for alcohol and other factors,

---

[4] Murphy was not asked any questions regarding the shape of the bottle or about any other identifying features he may have observed. Nevertheless, Murphy's testimony is inconsistent with a conclusion that the bottle more likely than not contained water or some other non-alcoholic beverage.

the difference between those two amounts could have had a significant impact on the degree to which he might have been impaired at the time of the accident.  Although Murphy's testimony as to *when* Niva consumed the alcohol is less than precise, it appears that he may have done so in the final half hour before the accident. Thus, it is at least possible that the alcohol had not fully taken effect at the time of the accident.   Additionally, as Niva points out, no evidence was adduced that he was slurring words, glassy-eyed, or otherwise showing obvious signs of alcohol intoxication, and no blood tests or other empirical evidence of intoxication was introduced.

Characterizing this accident as having occurred after the driver consumed a "pint of vodka" might lead to an assumption that alcohol impairment was a substantial factor–and perhaps even the most important factor– that led to incident.  BLM's proof, however, falls far short of showing that Niva was substantially impaired or that the degree to which he may have been impaired was the cause of this accident.  As Niva points out, Murphy testified that he did not see the washed out portion of the roadway before the vehicle hit it, and there is no suggestion in the record that Murphy had consumed any alcohol at the time.   As a passenger, Murphy was not necessarily paying the same amount of attention to the road ahead  as would a prudent driver, but his testimony supports an inference that even to the extent Niva's *speed* precluded him from observing the road hazzard in time, his alcohol consumption may not have been that significant a factor.[5]

That said, in light of the finding that Niva consumed at least a half-pint of alcohol in the half-hour preceding the accident, a reasonable inference is that such alcohol consumption had at least some effect on his judgment and his reaction time, and that those factors, in turn, contributed to the accident.  The Court so finds.

### 3. Seat belt usage

As an initial matter, BLM contends that the question of whether or not Niva was wearing a seatbelt goes to the causation of his *injuries* rather than to causation of the *accident*. As such, BLM argues, the seatbelt issues should not be addressed until damages are tried.

---

[5] Indeed, in post-trial arguments BLM suggested that the alcohol issue was one which the Court "could ignore."

6

1 Although BLM cites no authority in support of its argument, it has some logical appeal in
2 that there is no suggestion that the use or non-use of Niva's seatbelt caused or exacerbated the
3 accident. Similarly, in *McNeil v. Yellow Cab Co.*, 85 Cal.App.3d 116 (1978) the question was
4 whether a taxi cab passenger suffered greater injuries in an accident because he had not been able to
5 locate any seat belts. As here, liability and damages were bifurcated. On appeal from the liability
6 phase, the appellate court stated: "In the damage phase of the trial of this case expert evidence on
7 this issue may be necessary to differentiate between injuries caused plaintiff by the collision and
8 those caused him by the absence of visible seat belts." 85 Cal.App.3d at 119 n.2. Thus, while Niva
9 may be correct that the parties previously treated the seat belt issue as a question to be decided
10 during the proceedings on liability, there is at least some basis for BLM's argument that it should not
11 be addressed until the damages phase of this action.[6]

12 Nevertheless, because BLM failed to meet its burden to show as a factual matter that Niva
13 was not wearing his seatbelt at the time of the accident, the Court need not decide whether a failure
14 to use seat belts goes to an apportionment of liability or an apportionment of damages. There is no
15 direct evidence as to Niva's seatbelt usage; only conflicting inferences that may be drawn from the
16 circumstances. On the one hand, after the accident Niva was first observed outside the vehicle.
17 Given the paralyzing effect of his injuries, it might be possible to conclude it to be more likely he
18 was ejected from the vehicle during the accident than that he moved himself to that position after the
19 vehicle came to a stop. On the other hand, however, there was evidence of roof crush on the driver's
20 side that apparently was consistent with Niva sustaining his injury inside the vehicle. Although
21 neither side introduced medical evidence as to what Niva may or may not have been capable of
22 doing immediately after the accident, it appears at least possible that Niva sustained his neck fracture
23 inside the vehicle, but did not suffer a paralyzing injury to his spinal cord until sometime during his
24 efforts to exit the vehicle.

25 Particularly suggestive circumstantial evidence, however, is Murphy's uncontested testimony

---

[6] Conversely, however, the notion that the Court should first apportion fault for the accident and then apportion fault for the injuries seems peculiar, and BLM has presented no authority establishing that such a two-step process is required.

7

that the vehicle's emergency flashers were on after the crash. There is no indication that Murphy made any effort to turn the flashers on. While it might be theoretically possible that the flashers were somehow activated by the crash itself, a reasonable inference is that Niva manually turned them on once the vehicle came to a rest. To do so, he necessarily must have still been in the vehicle.

On this record, it cannot be determined whether or not Niva was using his seatbelt at the time of the accident. For purposes of assigning any comparative fault to Niva based on the seatbelt issue, BLM had the burden to show it more likely than not that Niva was unbelted. The Court finds that BLM failed to meet that burden.[7]

### C. Assigning comparative fault

The doctrine of comparative fault "is a flexible, commonsense concept, under which a [trier of fact] properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss.'" *Knight v. Jewett* 3 Cal.4th 296, 314 (1992). "'[C]omparative negligence' " does not lend itself to "the exact measurements of a micrometer-caliper." *Daly v. General Motors Corp.* 20 Cal.3d 725, 736 (1978); see also *American Motorcycle Assn. v. Superior Court* 20 Cal.3d 578, 594-595 (1978).

Niva urges the Court to assign substantially more fault to BLM than to him, arguing that BLM is culpable for doing nothing to ameliorate a situation that existed for many years and that endangered everyone who drove on the road. In contrast, Niva argues, his conduct was a "one time event, involving human error of a common nature." Niva's argument that BLM's negligence existed over a greater period of time has some weight. On the other hand, his suggestion that BLM should be assigned a greater degree of fault in this case because it endangered the public at large while Niva endangered only himself is not persuasive. It may be that Niva was the only person

---

[7] As Niva points out, even if the evidence supported a finding that he was unbelted, BLM would have the additional burden of introducing expert testimony to show the extent to which using a seatbelt would have lessened the extent of Niva's injuries. See *Truman v. Vargas*, 275 Cal.App.2d 976 (1969). Whether such evidence would properly be introduced in the damages phase or whether BLM should have introduced it in the liability phase is moot, in view of the finding that BLM failed to show Niva was unbelted.

*actually* injured by his own negligence,[8] but by speeding and driving after consuming at least a half pint of alcohol, Niva created a risk to the public at large just as much as BLM did. At a very minimum, Niva endangered his passenger.

Under all the circumstances here, the Court finds that the portion of responsibility attributable to BLM is 65 %. The remaining 35 % is Niva's own responsibility.

### III. CONCLUSION

Comparative responsibility for Niva's injuries is assigned as set out above. The parties shall appear for a further case management conference on June 25, 2008 at 2:30 p.m. Ten days prior to that conference, the parties shall file a joint case management conference describing any further evidentiary or other proceedings that may be needed in this action and proposing dates for such matters.

IT IS SO ORDERED.

Dated: April 11, 2008

RICHARD SEEBORG
United States Magistrate Judge

---

[8] By the same token, Niva was the only person actually injured by the road condition.

OPINION AND ORDER
C 03-0908 RS

9

**THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN GIVEN TO:**

Claire T. Cormier     claire.cormier@usdoj.gov

John Charles Stein     boccardo@boccardo.com, jstein@boccardo.com, tracey@boccardo.com

Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the Court's CM/ECF program.

**Dated: 4/11/08**                                        **Richard W. Wieking, Clerk**

                                                          **By:     Chambers**

OPINION AND ORDER
C 03-0908 RS

**United States District Court**
For the Northern District of California